UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
VALERIE MEDCALF,                                                         :
                                                                         :        12 Civ. 5091 (PAE)
                                        Plaintiff,                       :
                        -v-                                              :        OPINION & ORDER
                                                                         :
EVELYN WALSH and GEORGE J. WALSH, III,                                   :
                                                                         :
                                        Defendants.                      :
                                                                         :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      This case involves a lawsuit by a legal secretary, Valerie Medcalf, against the law firm partner for whom she worked, George J. Walsh III, and the partner's wife, Evelyn Walsh. Medcalf's claims arise out of her discovery of emails between the Walshes commenting upon her, which in turn touched off a series of events that led the law firm, Thomson Hine LLP ("TH"), to terminate her. Medcalf brings claims for: (1) conspiracy to commit tortious interference with business relations, (2) tortious interference with business relations, (3) intentional infliction of emotional distress, and (4) defamation. Defendants move to dismiss Medcalf's Amended Complaint. For the reasons that follow, that motion is granted.

**I.    Background**

      **A.  Factual Background**[1]

      Between May 4, 2005, and February 28, 2012, Medcalf worked as a legal secretary in the New York City office of TH. Am. Compl. ¶¶ 10, 37. On June 17, 2005, she was permanently assigned to support defendant George J. Walsh, III ("George"), a partner in the firm. Id. ¶ 11.

---

[1] The Court's account of the underlying facts in this case is drawn from the Amended Complaint (Dkt. 15) and the exhibits attached thereto.

Among Medcalf's duties were answering George's phone and placing calls for him. *Id.* ¶ 12. Through those duties, Medcalf first met defendant Evelyn Walsh ("Evelyn"), who married George on June 24, 2006, and whose wedding Medcalf attended as an invited guest. *Id.* ¶¶ 9, 12.

As part of her job responsibilities, Medcalf was given, in writing, full access to George's Outlook email account. *Id.* ¶ 13. She was required often to access George's email account to locate materials that George needed to do his job. *Id.* ¶ 14. Medcalf had authorized access to George's account until February 21, 2012, a week before her termination. *Id.* ¶ 35.

In fall 2010, Medcalf became pregnant. *Id.* ¶ 15. Medcalf believed that George had a "negative attitude" toward Medcalf because of her regular prenatal appointments. *Id.* ¶ 16. Following the birth of her baby in May 2011, Medcalf began experiencing symptoms of postpartum depression and associated mental health issues, including severe anxiety and panic attacks. *Id.* ¶ 18. On or about August 5, 2011, Medcalf began her leave from TH to tend to these issues. *Id.* ¶ 21. On or about August 8, 2011, Dr. Wei Wang, a psychiatrist, advised Medcalf that the severity of her postpartum-related mental issues would likely require her to take up to five months of leave from TH. *Id.* ¶ 22.

On Friday August 12, 2011, Medcalf told George and her TH supervisors, by email, of the need for a five-month leave based on that diagnosis. *Id.* ¶ 23, Ex. A. In the email, Medcalf asked that the email's contents be kept confidential. *Id.* Ex. A. On or about October 4, 2011, Medcalf began regular psychiatric treatment with Dr. Paul Schneck, who, as of the date of the Amended Complaint, continued to treat Medcalf. *Id.* ¶ 24.

On November 21, 2011, Medcalf returned to TH. She learned that a different legal secretary had been assigned to George. *Id.* ¶¶ 25–26. However, Medcalf remained George's

back-up secretary and George continued to ask Medcalf to locate emails that George needed to perform his work duties. *Id.* ¶ 27.

On or about December 15, 2011, Evelyn and Medcalf saw each other at TH's offices, and Evelyn asked about Medcalf's well-being. *Id.* ¶ 28. Medcalf told Evelyn that she was seeing a psychologist and on medication. Medcalf states that she felt "intimated [*sic*] because of [Evelyn]'s status as a partner's wife." *Id.*

On February 20, 2012, while performing her regular duties, Medcalf discovered an email exchange between George and Evelyn dated August 12, 2011. In the first email in the exchange, George forwarded to Evelyn the email that he had received from Medcalf the same day, announcing her five-month leave. He wrote: "Note this." *Id*. Ex. A. In response, Evelyn wrote:

> I thought she said she had an emergency doctors [*sic*] appointment, why the ER? . . . But generally true post partum depression appears after a few months and I'd ask why they're asking for five months so early in the process. . . . Is it coincidence that that this gives her the rest of the year off and eligible for disability benefits? Sorry, I hope she ok but it just all seems suspect to me.

*Id.* Evelyn concluded her email to her husband: "All the Monday's and Friday's off, and other stuff which has been ongoing. You don't need this. You've been very good to her. You deserve someone you can rely on." *Id.*

After finding the August 12, 2011 email exchange between George and Evelyn, Medcalf discovered other email exchanges between George and Evelyn, many including emails from Medcalf that George had forwarded to Evelyn. *Id.* ¶¶ 31–32. In one, dated August 31, 2011, George told Evelyn that he had emailed Medcalf to ask about her well-being following Hurricane Irene, and attached his email exchange with Medcalf. *Id*. Ex. B. Responding to George, Evelyn reiterated her skepticism of Medcalf's difficulties: "Once again I have to say that [Medcalf] doesn't act like a person who has such severe

3

post partum that she can't work. The email is not indicative of any mood disorder and she talks right along." *Id*.

Medcalf also discovered a June 30, 2011 email exchange between George and Evelyn, in which George forwarded a picture of Medcalf's infant, which Medcalf had sent to several people at TH. George wrote to Evelyn: "The first picture of Valerie's baby. Very cute!!" *Id*. Ex. C. In response to George, Evelyn wrote, "[The baby] is adorable but if [Medcalf] had had a decent shower she would have some nice cotton, clean and non fuzzy blankets to safely sleep [the baby] on. Ugh. It's good that [Medcalf] seems to have bonded with her though and is exited [*sic*] enough to share pictures, that's a good sign." *Id.*

Ultimately, Medcalf discovered seven additional email exchanges between George and Evelyn, spanning August 3, 2009, to August 5, 2011. *Id.* Ex. E. The email exchanges generally take the form of (1) emails from Medcalf to George reporting that she would not be at work that day, which George then forwarded to Evelyn with such comments as: "UGH!!!!"; "No Valerie today"; "Not a good way to start the week"; "This is not good. I'll email Carol for coverage," *id*.; and (2) replies by Evelyn, including commentary such as: "And you are so busy today and need her. This sounds fishy. It's a nice day and a Monday. I'm sorry"; "I hope this is not the shape of things to come. Isn't it suspect that these little emergencies are always on Friday or Monday? It's so not fair to you. You need her to be there"; and, "She doesn't say she's sick. You should ask her what's wrong with her." *Id*.

On February 21, 2012, one day after discovering these email exchanges, Medcalf emailed Evelyn to confront her. Medcalf carbon copied George and blind carbon copied

4

her TH supervisors. *Id.* ¶ 33. Medcalf accused Evelyn of making "despicable and disgusting remarks" about Medcalf's daughter and requested that Evelyn "stop disrespecting [Medcalf]" and "stop disrespecting [Medcalf's] daughter." *Id.* Ex. F. Evelyn responded to Medcalf's email within an hour, carbon copying George. *Id.* In her response, Evelyn apologized if she was "unfairly judgemental" regarding Medcalf's absences and explained that her concern had been for the effect that Medcalf's absences had on George. *Id.* Evelyn denied making negative comments about Medcalf's daughter and expressed good wishes for Medcalf's daughter. *Id.*

On February 22, 2012, Medcalf approached the TH supervisors whom she had blind copied on her email to Evelyn, seeking "guidance because of the politically volatile" situation. *Id.* ¶ 33. Medcalf's supervisors informed her they would investigate the matter in consultation with the firm's human resources department. *Id.*

Medcalf then responded to Evelyn's email from the previous day, again carbon copying George and blind carbon copying her TH supervisors. *Id.* ¶ 34 & Ex. F. Medcalf reiterated her claim that Evelyn had made disparaging remarks about Medcalf's baby; she asserted that the email exchanges between Evelyn and George during her pregnancy "amount to discrimination based on pregnancy." *Id.* She also claimed that she had discovered the series of email exchanges over a period of time—discovering the August 31, 2011 email exchange during her work duties and another exchange upon her return from a vacation or other leave day. *Id.*[2]

Later in the day on February 22, 2012, Medcalf's access to George's Outlook account was terminated. At approximately 2:30 p.m., Medcalf's TH supervisor instructed her to leave

---

[2] That statement is contradicted by Medcalf's Amended Complaint, which alleges that Medcalf discovered all of the email exchanges on February 20, 2011. Am. Compl. ¶¶ 29–32.

the office pending investigation of the matter. *Id.* ¶¶ 35–36. On or about February 28, 2012, TH terminated Medcalf's employment. *Id.* ¶ 37.

### B. Procedural History

On June 29, 2012, Medcalf filed her initial Complaint. Dkt. 1. On October 22, 2012, after defendants moved to dismiss, Medcalf filed an Amended Complaint. Dkt. 15. The basis for jurisdiction is diversity jurisdiction, pursuant to 28 U.S.C. § 1332. Am. Compl. ¶ 4.[3]

On November 12, 2013, defendants moved to dismiss the Amended Complaint. Dkt. 17–19. On December 3, 2012, Medcalf filed her brief in opposition. Dkt. 20. On December 12, 2012, defendants filed a reply brief. Dkt. 22. On February 26, 2013, the Court heard argument on the motion.

## II. Applicable Legal Standard

In resolving a motion to dismiss, the Court must "construe the Complaint liberally, accepting all factual allegations in the Complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." *Galiano v. Fid. Nat'l Title Ins. Co.*, 684 F.3d 309, 311 (2d Cir. 2012). Nevertheless, the "[f]actual allegations must be enough to raise a right of relief above the speculative level," and the complaint must plead "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [plaintiff's claim]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Put differently, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

---

[3] Medcalf is a resident of New Jersey. The Walshes are residents of New York. Am. Compl. ¶ 4.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In applying these principles, the Court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Tarshis v. Riese Org.*, 211 F.3d 30, 39 (2d Cir. 2000) (citing *Allen v. Westpoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991)). Here, this includes the Amended Complaint, as well as the emails attached as exhibits to it. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

### III. Discussion

As noted, Medcalf alleges four causes of action against George and Evelyn Walsh, who are the sole defendants.[4] The Court considers them in turn.

#### A. Defamation

The Amended Complaint alleges that the email exchanges that Medcalf discovered between George and Evelyn contained false statements that defamed Medcalf's character and reputation, ultimately resulting in the termination of her employment at TH.

---

[4] Medcalf initially brought claims against 25 additional unnamed defendants. But, at the initial conference in this case, she announced her intent to abandon such claims, which might have destroyed diversity jurisdiction, and the Amended Complaint does not pursue them.

To establish a claim for defamation under New York law, a plaintiff must prove that: (1) the defendant published a defamatory statement of fact to a third party, (2) that the statement of fact was false, (3) the false statement of fact was made with the applicable level of fault, and (4) either the false statement was defamatory per se or caused the plaintiff special harm.  *See, e.g.*, *Chandok v. Klessig*, 632 F.3d 803, 814 (2d Cir. 2011); *Peters v. Baldwin Union Free Sch. Dist.*, 320 F.3d 164, 169 (2d Cir. 2003); *Thompson v. Bosswick*, 855 F. Supp. 2d 67, 76 (S.D.N.Y. 2012).  An otherwise defamatory statement can nevertheless be protected by privilege.  *See Chandok*, 632 F.3d at 814.

### 1. Publication

To satisfy the publication element of defamation, the defendant must have published a defamatory statement of fact to a third party.  *See Thompson*, 855 F. Supp. 2d at 76.  "A defamatory writing is not published if it is read by no one but the one defamed."  *Ostrowe v. Lee*, 256 N.Y. 36, 38 (N.Y. 1931) (Cardozo, C.J.).

For the purpose of establishing a claim of defamation under New York law, "all communications between [spouses], on any subject, [a]re absolutely privileged based on [the spouses'] status as a married couple."  *Sexter & Warmflash, P.C. v. Margrabe*, 828 N.Y.S.2d 315, 322 n.4 (1st Dep't 2007); *see Lawler v. Merritt*, 48 N.Y.S.2d 843, 844–45 (N.Y. Sup. Ct. 1944) ("[I]t continues to be the law that a communication from one spouse to another may not be deemed a publication."), *aff'd*, 53 N.Y.S.2d 465 (1st Dep't 1945)); *see also Dyer v. MacDougall*, 93 F. Supp. 484, 486 (E.D.N.Y. 1950) ("A communication from husband to wife in the absence of a third person is not publication, and is not actionable as slander, whatever the motive may be, and though the statement may be false."); Restatement (Second) of Torts § 592 ("A husband or a wife is absolutely privileged to publish to the other spouse defamatory matter concerning a third

8

person."). Therefore, because George and Evelyn are spouses, the communications between them, which are the sole basis for Medcalf's defamation claim, do not constitute publication.

Medcalf argues that the marital communications privilege does not apply to emails sent using a law firm's email network (here, TH's), because such communications were not sent "in confidence," as firm employees lack a reasonable expectation of privacy in such emails. *See* Pl. Br. 7 (citing *In re Reserve Fund Secs. and Derivative Litig.*, 275 F.R.D. 154, 159–65 (S.D.N.Y. 2011)). But the cases so holding involve invocation of the evidentiary privilege for marital communications. The question here, however, does not involve the admissibility of evidence, but New York's law of defamation. On that state-law question, New York law is clear that "communication from one spouse to another may not be deemed a publication," *Lawler*, 48 N.Y.S.2d at 844–45, and the case law does not reflect an exception for spousal communications made via media which third parties may be capable of accessing.

Alternatively, Medcalf appears to argue that the publication element was satisfied by Medcalf's act of forwarding the spousal emails to her supervisors at TH. As an initial matter, it is unclear whether the narrow doctrine of "compelled self-publication," which permits in limited contexts a defamation action to go forward even where it is the defamed party who publishes a defamatory statement to a third party, is recognized under New York law. *See, e.g.*, *Clemons v. WellPoint Cos.*, No. 1:11-civ-0084 (JLM), 2013 WL 1092101, at *16 (N.D.N.Y. March 15, 2013) (collecting cases); *Ascione v. Pfizer, Inc.*, 312 F. Supp. 2d 572, 579 n.5 (S.D.N.Y. 2004); *Metchick v. Bidermann Indus. Corp.*, No. 91 Civ. 2329 (PNL), 1993 WL 106139, at *4–5 (S.D.N.Y. Apr. 7, 1993). But even if it were, it would not apply here, because Medcalf was fully aware of the allegedly defamatory nature of the Walshes' email communications when she forwarded them to others. *See Metchick*, 1993 WL 106138, at *5.

9

Thus, the Amended Complaint fails to allege facts to support the publication element of defamation.

### 2. Remaining Elements of Defamation

In any event, the Amended Complaint does not plausibly allege the other elements of defamation.

First, as alleged, defendants did not make a false statement of fact. "[A] statement of opinion that is accompanied by a recitation of the facts on which it is based or one that does not imply the existence of undisclosed underlying facts" is protected as a statement of opinion and thus not a false statement of fact. *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 154 (1993) (citing *Ollman v. Evans*, 471 U.S. 1127 (1985)). Here the comments by the Walshes (largely Evelyn) that Medcalf claims are actionable include: "I'd ask why they're asking for five months so early in the process . . . . Is it a coincidence that this gives her the rest of the year off . . . ?"; "[Medcalf] doesn't act like a person who has . . . such severe post partum that she can't work. The email is not indicative of any mood disorder."; "Well I guess this is going to be the way it is."; and, "Isn't it suspect that these . . . emergencies are always on Friday or Monday?" None of these statements "implies a basis in facts which are not disclosed to the reader or listener." *Gross*, 82 N.Y.2d at 153. Examining the comments in context, these statements are expressions of opinion, largely consisting of Evelyn's skepticism that Medcalf had a legitimate basis to take time away from work. None of them implies any knowledge by Evelyn of undisclosed facts.

Second, the Amended Complaint does not plausibly allege that these statements were made with the applicable level of fault. Even assuming the applicable level of fault is mere

10

negligence and not more demanding,[5] no facts are alleged that give rise to a plausible inference that either George or Evelyn negligently commented about Medcalf in their email exchanges.

Finally, the Amended Complaint does not allege facts to support a conclusion that the statements in defendants' emails are *per se* defamatory or caused her special damages. Defamation *per se* absolves a plaintiff from proving special harm where, as is potentially relevant here, "a statement . . . tends to injure another in his or her trade, business, or profession." *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 551 (S.D.N.Y. 2010) (citing *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (1992); *Albert v. Loksen*, 239 F.3d 256, 271 (2d Cir. 2001)). But this exception is "limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities.'" *Liberman*, 80 N.Y.2d at 436 (citation omitted). Moreover, "[a] cause of action for injury to business reputation accrues when the false statement becomes widely known or is brought to the attention of the general public. Statements made to other employees in the workplace do not meet this standard as determined under New York law." *Murphy v. Cadillac Rubber & Plastics, Inc.*, 946 F. Supp. 1108, 1124 (W.D.N.Y. 1996) (citing *Celi v. Canadian Occidental Petroleum Ltd.*, 804 F. Supp. 465, 470 (E.D.N.Y. 1992)). Here, the statements made about Medcalf were directed at her character or general qualities, rather than her competence as an assistant, and were not brought to the attention of the general public. They do not constitute defamation *per se*. *See*

---

[5] The New York Court of Appeals has not addressed the level of fault that applies to defamation claims based on publication to a limited, private audience. *See Albert v. Loksen*, 239 F.3d 256, 270 (2d Cir. 2001). One intermediate court has held that a plaintiff in such circumstances "need show only that defendants were negligent in publishing the [statement]," *Krauss v. Globe Int'l, Inc.*, 674 N.Y.S.2d 662, 665 (1st Dep't 1998), but the Second Circuit has stated that it is "somewhat reluctant to view *Krauss* as binding on this issue," *Albert*, 239 F.3d at 270 n.12.

11

*Pure Power Boot Camp, LLC*, 813 F. Supp. 2d at 551 (statements characterizing plaintiff as a "loose cannon" and a "liar" and claiming the plaintiff "hates homosexuals" not defamatory *per se* because the statements reflected personal characteristics rather than reflections of professional competence); *Murphy*, 946 F. Supp. at 1124 (statements that plaintiff "did not know her job and did not know what she was doing" not defamatory *per se* because they did not pose potential harm to plaintiff's business reputation).

Nor has Medcalf alleged facts that plausibly give rise to the inference that she suffered special damages as a result of the Walshes' communications. Special damages are characterized as "the loss of something having economic or pecuniary value." *Liberman*, 80 N.Y.2d at 434–35 (citation omitted). Here, the Amended Complaint makes only the conclusory statement that her employment was terminated as a result of the contents of the spousal emails. It does not allege a plausible basis for that conclusion. Further, under New York law, "where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 300 (1983); *see Peterc-Tolino v. Harap*, 892 N.Y.S.2d 154, 156 (2d Dep't 2009) (plaintiff "cannot use [a defamation claim] to recover damages for his entirely lawful termination"). Medcalf did not have a continued right to employment at TH. Nor does the Amended Complaint allege any other form of economic loss.

For these reasons, Medcalf's defamation claim must be dismissed.

### B.     Intentional Infliction of Emotional Distress

The Amended Complaint alleges that the Walshes' email exchanges were intended to cause Medcalf severe emotional distress. Under New York law, to establish such a claim, a plaintiff must prove four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or

disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993).

To establish the first element, the conduct in question must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Murphy*, 58 N.Y.2d at 303 (citation omitted); *see also Howell*, 81 N.Y.2d at 122. The element of outrageous conduct is "rigorous, and difficult to satisfy," and its purpose is to filter out trivial complaints and assure that the claim of severe emotional distress is genuine. *Howell*, 81 N.Y.2d at 122 (citation omitted). A court may determine, as a matter of law, that the alleged behavior is not sufficiently outrageous to warrant the imposition of liability. *Id.* at 121.

Further, in New York, the tort of intentional infliction of emotional distress is "extremely disfavored." *Hogan v. J.P. Morgan Chase Bank*, No. 05-cv-5342 (JS), 2008 WL 4185875, at * 4 (E.D.N.Y. Sept. 4, 2008) (citing *Durant v. A.C.S. State & Local Solutions Inc.*, 460 F. Supp. 2d 492, 499 (S.D.N.Y. 2006)). Only the most egregious conduct has been found sufficiently extreme and outrageous to establish this tort. *Compare Roach v. Stern*, 675 N.Y.S.2d 133, 136 (2d Dep't 1998) (holding, over one dissent, that a jury might reasonably conclude that the intentional handling of cremated human remains "went beyond the bounds of decent behavior" so as to give rise to a claim for intentional infliction of emotional distress), *with Biberaj v. Pritchard Indus.*, 859 F. Supp. 2d 549, 565 (S.D.N.Y. 2012) (holding that supervisor's act of calling employee names including "bitch", "slut", "whore", "monkey face", and "animal" were insufficiently extreme and outrageous), *Elmowitz v. Exec. Towers at Lido, LLC*, 571 F. Supp. 2d 370, 379 (E.D.N.Y. 2008) (holding that publicly shouting derogatory remarks and hitting

plaintiff multiple times with a telephone were insufficiently extreme and outrageous), *Kaye v. Trump*, 873 N.Y.S.2d 5, 6 (1st Dep't 2009) (holding that making rude remarks, commencing two baseless lawsuits, and attempting to instigate an arrest were insufficiently extreme and outrageous to give rise to such a claim), *and Doe v. Cmty. Health Plan-Kaiser Corp.*, 709 N.Y.S.2d 215, 218 (3d Dep't 2000) (disclosure of plaintiff's medical records by medical corporation not sufficiently extreme and outrageous).

Viewed in light of this body of precedent, the conduct alleged in the Amended Complaint, even viewed in the light most favorable to Medcalf and accepting as true her claim that it caused her great distress, falls very far short of the egregious and outrageous conduct necessary to make out a claim for intentional infliction of emotional distress. The comments in question were contained in emails between two spouses, and on their face there is no reason to impute an intention to the Walshes that their commentary about Medcalf achieve broader circulation. Further, as to their substance, Evelyn's comments critiquing Medcalf's baby's blankets as unclean and low-quality, or suggesting abusive leave-taking practices by Medcalf, are a far cry from the conduct in cases held *non*-actionable by the New York courts. Far from "go[ing] beyond all possible bounds of decency," *Murphy*, 58 N.Y.2d at 303, these statements are the sorts of quotidian negative commentary exchanged in countless daily conversations in our free society.

Medcalf relies on a recent case in this district in which, applying Texas state law, the Court noted that "outrageousness may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." *Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380, 396 (S.D.N.Y. 2008) (citation omitted). But that case does not rescue Medcalf's claim. Although "it is true that

14

knowledge of the particular sensitivity of a defendant can support a finding of intentional infliction of emotional distress," defendants' comments here are "simply too mundane to give rise to a colorable claim." *Santos v. Gen. Elec. Co.*, No. 10 Civ. 6948 (MHD), 2011 WL 5563544, at * 11 (S.D.N.Y. Sept. 28, 2011), *report and recommendation adopted in full by* 2011 WL 5563536 (S.D.N.Y. Nov. 15, 2011). The Amended Complaint does not make any non-conclusory allegation that the Walshes, although aware of Medcalf's claim that she suffered severe postpartum depression, knew their comments would cause unusual harm of the sort necessary to establish a claim for intentional infliction of emotional distress.

Finally, the Amended Complaint does not allege facts sufficient to establish the other elements of this tort. As to the second element, it does not recite facts that give rise to the plausible inference that the defendants intended to cause, or disregarded the substantial probability of causing, severe emotional distress through their spousal exchanges by email. The substance of the emails in question is unremarkable: The Walshes' criticisms of Medcalf are banal, not lethal. And the context in which they were sent is such that the Walshes did not have good reason to expect Medcalf ever to read them: Although Medcalf was granted access to George's email account to access emails relating to George's client work at TH as directed by George, there is no plausible allegation that Medcalf had good reason to review spousal communications in that account. That her curiosity or inclination to snoop led her to do so does not give her a cause of action that otherwise is lacking.

As to the third and fourth elements, a plaintiff must demonstrate a "causal connection" between the conduct and her "severe emotional distress." *Howell*, 81 N.Y.2d at 121. To qualify as severe emotional distress, "the emotional distress suffered by the plaintiff must be so severe that no reasonable [person] could be expected to endure it." *Wiener v. Unumprovident Corp.*,

15

202 F. Supp. 2d 116, 122 (S.D.N.Y. 2002) (citation omitted). The Amended Complaint does not make any non-conclusory allegation that Medcalf suffered severe emotional distress. And even assuming it did, Medcalf fails to identify any basis to believe that her distress was caused by her discovery of the Walshes' communications: The psychiatric treatment that the Amended Complaint recites as evidence of her distress predates defendants' conduct. It does not allege that her condition has materially changed since Medcalf discovered the allegedly offending emails.

Accordingly, Medcalf fails to state a claim for intentional infliction of emotional distress.

### C. Conspiracy to Commit Tortious Interference with Business Relations, and Tortious Interference with Business Relations

The Court addresses together Medcalf's claims for conspiracy to commit tortious interference with business relations and tortious interference with business relations.

Under New York law, the elements of tortious interference with business relations are: "(1) [plaintiff] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 400 (2d Cir. 2006) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 17 (2d Cir. 2003)). The New York Court of Appeals has explained that:

> where a suit is based on interference with a nonbinding relationship, the plaintiff must show that defendant's conduct was not "lawful" but "more culpable." The implication is that, as a general rule, the defendant's conduct must amount to a crime or an independent tort. Conduct that is not criminal or tortious will generally be "lawful" and thus insufficiently "culpable" to create liability for interference with prospective contracts or other nonbinding economic relations.

*Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004). An exception to this rule "has been recognized where a defendant engages in conduct for the sole purpose of inflicting intentional harm on plaintiffs." *Id.* (citation omitted).

Thus, to state a claim, the Amended Complaint must sufficiently allege a crime or independent unlawful action by the defendants, or alternatively Medcalf must plausibly allege that the defendants acted with the sole purpose of inflicting intentional harm on Medcalf. As to the first route, however, as Medcalf's counsel conceded during argument, her claims of unlawful action extend no further than the claims (which the Court has already found wanting) for defamation and intentional infliction of emotional distress. As to the second, the Amended Complaint alleges that the defendants acted "with actual malice and ill will toward [Medcalf], and with the intentional and improper purpose of . . . causing financial, professional, and emotional damage . . . ." Am. Compl. ¶ 45. But, aside from this conclusory statement, it does not allege facts that give rise to the plausible inference that the defendants acted with the "sole purpose of inflicting intentional harm" on Medcalf. *Carvel*, 3 N.Y.3d at 190. Accordingly, the claim for tortious interference with business relations must be dismissed.

As to Medcalf's allegation of conspiracy to commit this tort, it fails, too. Under New York law, "'a mere conspiracy to commit a [tort] is never of itself a cause of action.'" *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986) (quoting *Brackett v. Griswold*, 112 N.Y. 454, 467 (1889)). Thus, plausible "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." *Alexander*, 68 N.Y.2d at 969 (citing *Brackett*, 68 N.Y.2d at 467; *Danahy v. Meese*, 446 N.Y.S.2d 611, 614 (1981)).

## CONCLUSION

For the foregoing reasons, the motion to dismiss is granted, and the Amended Complaint is dismissed with prejudice as to all defendants. The Clerk of Court is directed to terminate the motions pending at docket numbers 6 and 17, and to close this case.

SO ORDERED.

                                                                               *Paul A. Engelmayer*
                                                                               Paul A. Engelmayer
                                                                               United States District Judge

Dated: April 9, 2013
       New York, New York